UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF ALABAMA

| | |
|---|---|
| FEDERAL TRADE COMMISSION,<br><br>    Plaintiff,<br><br>    v.<br><br>PSC ADMINISTRATIVE, LLC, a limited liability company, f/k/a PAYDAY SUPPORT CENTER, LLC;<br><br>COASTAL ACQUISITIONS, LLC, a limited liability company, d/b/a INFINITY CLIENT SOLUTIONS and INFINITYCOLLECT, LLC;<br><br>JARED IRBY, individually and as an officer or managing member of Coastal Acquisitions, LLC and PSC ADMINISTRATIVE, LLC; and<br><br>RICHARD HUGHES, individually and as an officer of PSC ADMINISTRATIVE, LLC;<br><br>    Defendants. | Case No. _____<br><br>**COMPLAINT FOR PERMANENT INJUNCTION AND OTHER EQUITABLE RELIEF** |

Plaintiff, the Federal Trade Commission ("FTC"), for its Complaint alleges:

1.      The FTC brings this action under Sections 13(b) and 19 of the Federal Trade Commission Act ("FTC Act"), 15 U.S.C. §§ 53(b) and 57b, and the Telemarketing and Consumer Fraud and Abuse Prevention Act ("Telemarketing Act") 15 U.S.C. § 6101 *et seq*., to obtain preliminary and permanent injunctive relief, rescission or reformation of contracts, restitution, the refund of monies paid, disgorgement of ill-gotten monies, and other equitable relief for Defendants' acts or practices in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), and the FTC's

Telemarketing Sales Rule ("TSR"), 16 C.F.R. Part 310, in connection with the marketing and sale of debt relief services.

## JURISDICTION AND VENUE

2.      This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 1337(a), and 1345, and 15 U.S.C. §§ 45(a), 53(b), 57b, 6102(c), and 6105(b).

3.      Venue is proper in this district under 28 U.S.C. § 1391(b)(1), (b)(2), (c)(1), (c)(2), and (d), and 15 U.S.C. § 53(b).

## PLAINTIFF

4.      The FTC is an independent agency of the United States Government created by statute. 15 U.S.C. §§ 41-58.   The FTC enforces Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), which prohibits unfair or deceptive acts or practices in or affecting commerce.   The FTC also enforces the Telemarketing Act, 15 U.S.C. § 6101 *et seq*.   Pursuant to the Telemarketing Act, the FTC promulgated and enforces the TSR, 16 C.F.R. 310, which prohibits deceptive or abusive telemarketing acts or practices.

5.      The FTC is authorized to initiate federal district court proceedings, by its own attorneys, to enjoin violations of the FTC Act and the TSR, and to secure such equitable relief as may be appropriate in each case, including rescission or reformation of contracts, restitution, the refund of monies paid, and the disgorgement of ill-gotten monies.   15 U.S.C. §§ 53(b), 56(a)(2)(A), 56(a)(2)(B), 57b, 6102(c), and 6105(b).

## DEFENDANTS

6.      Defendant PSC Administrative, LLC, ("Payday Support Center"), formerly known as Payday Support Center, LLC, and doing business as Payday Support Center, is an Alabama limited liability company with its principal place of business at 800 Hillcrest Road, Mobile, AL 36695.   Payday Support Center transacts or has transacted business in this district and throughout the United States.   At all times material to this Complaint, acting alone or in concert with others, Payday Support Center has advertised, marketed, distributed, or sold debt relief services to consumers throughout the United States.

7.      Defendant Coastal Acquisitions, LLC ("Coastal Acquisitions"), doing business as Infinity Client Solutions and iNfinityCollect, LLC, is an Alabama limited liability company with its registered place of business at 2058 Point Leger Rd., Mobile, AL, 36605.   Coastal Acquisitions also operates the Infinity Client Solutions telemarketing call center at 1216 Azalea Rd., Mobile, AL, 36693.   Coastal Acquisitions registered the fictitious trade names iNfinityCollect in Texas and iNfinityCollect, LLC in Ohio.   Coastal Acquisitions transacts or has transacted business in this district and throughout the United States.   At all times material to this Complaint, acting alone or in concert with others, Coastal Acquisitions has advertised, marketed, distributed, or sold debt relief services to consumers throughout the United States.

8.      Defendant Jared Irby is a managing member of Payday Support Center and an officer of Coastal Acquisitions.   At all times material to this Complaint, acting alone or in concert with others, he has formulated, directed, controlled, had the authority to control, or participated in the acts and practices set forth in this Complaint.   For example, Defendant Jared Irby has participated in the daily operation of Payday Support Center and Coastal Acquisitions, including

3

by arranging and paying for those companies' websites.   Several telephone numbers from

Payday Support Center advertisements have been redirected to a phone number registered to

Defendant Jared Irby.   Defendant Jared Irby resides in this district and, in connection with the

matters alleged herein, transacts or has transacted business in this district and throughout the

United States.

9.      Defendant Richard Hughes is an officer of Payday Support Center.   At all times material

to this Complaint, acting alone or in concert with others, he has formulated, directed, controlled,

had the authority to control, or participated in the acts and practices set forth in this Complaint.

For example, Defendant Richard Hughes has participated in the daily operation of Payday

Support Center by registering at least one of the company's websites at

www.paydaysupportcenter.com.   Defendant Richard Hughes resides in this district and, in

connection with the matters alleged herein, transacts or has transacted business in this district

and throughout the United States.

10.     Defendants Payday Support Center and Coastal Acquisitions (collectively, "Corporate

Defendants") have operated as a common enterprise while engaging in the deceptive and

unlawful acts and practices and other violations of law alleged below.   Defendants have

conducted the business practices described below through an interrelated network of companies

that have comingled funds, common officers, and common business functions.   Because these

Corporate Defendants have operated as a common enterprise, each of them is jointly and

severally liable for the acts and practices alleged below.   Defendants Jared Irby and Richard

Hughes have formulated, directed, controlled, had the authority to control, or participated in the

acts and practices of the Corporate Defendants that constitute the common enterprise.

4

## COMMERCE

11.     At all times material to this Complaint, Defendants have maintained a substantial course of trade in or affecting commerce, as "commerce" is defined in Section 4 of the FTC Act,15 U.S.C. § 44.

## DEFENDANTS' BUSINESS ACTIVITIES

12.     From at least August 2012, Defendants have solicited consumers who seek debt relief services through the Internet, radio, or telemarketing.   Defendants have targeted consumers who owe multiple debts on short-term, high interest loans, commonly referred to as "payday loans" or "payday loan cash advances."   Such loans typically have interest rates of approximately 400% APR.   Defendants have induced consumers to enroll in their program by claiming that they will renegotiate the repayment terms of consumers' loans so that consumers' payments will be reduced.   Defendants advise consumers to terminate their direct payments to lenders and pay money into Defendants' program instead.   Defendants have promised consumers that, at the end of a four to six month program term, the consumers' loans will be paid off or otherwise eliminated.   Defendants' efforts for many consumers have consisted of little more than sending a form letter to consumers' payday lenders requesting "validation" of the underlying loan.   In those instances, Defendants have not renegotiated the repayment terms of consumers' loans.   In numerous instances, Defendants' actions have failed to result in any reduction or elimination of the payday loans consumers enrolled in Defendants' program.   Defendants have collected a fee at enrollment and, thereafter, bi-weekly through the pendency of the program.   In numerous instances, consumers discovered that none of the payments made through the program went towards paying off their loans.

**Defendants' Advertisements**

13.     Defendants have solicited consumers across the United States through radio

advertisements and an Internet website that have promised payday loan debt relief.

14.     For example, the following radio advertisement has run on various dates in different

states across the country, including Texas, New York, Tennessee, and Florida:

> Are payday loans ruining your life?   Do you have more payday loans than you're able to
> pay back right now?   If you have two or more payday loan cash advances, listen closely.
>
> You may be eligible for a program that payday loan companies don't want you to know
> about, a program that will get payday loan companies out of your bank account and put
> an end to the payday loan nightmare.
>
> So call [toll free number] to find out if the program is right for you.
> …
> All you need is two or more payday loan cash advances to qualify.   Even if you're
> behind, in collections or have bad credit.   We'll even help you with your internet payday
> loans….

15.     Defendants' radio advertisements have included various toll-free telephone numbers for

consumers to call for "help" that have redirected to a single telephone number operated by

Defendants.

16.     Defendants have also solicited consumers through the Internet with a website offering

payday loan help at www.paydaysupportcenter.com.   The website has included the following

text:   "TOO MANY PAYDAY LOANS?   LET US HELP!" and has instructed consumers to

call a toll-free telephone number operated by Defendants.

**Defendants' Telemarketing Pitch for the "Financial Hardship Program"**

17.     When consumers have called the phone number from Defendants' radio advertisements or website, they have spoken to Defendants' telemarketers about the "financial hardship program" wherein Defendants have offered to resolve consumers' payday loan debts.

18.     Defendants' telemarketers have first gone through a purported "qualification check" with consumers to determine if the consumers owe at least two payday loans.

19.     In numerous instances, after confirming their "qualifications," Defendants' telemarketers have offered to substantially reduce consumers' monthly payments from what consumers owe their payday lenders at the time of enrollment.   In numerous instances, Defendants' telemarketers have offered to "get rid of," "pay off," or "take care of" all of consumers' payday loan debts by the end of the consumers' enrollment in Defendants' four to six month program.

20.     Defendants' telemarketers have typically mentioned "validation" as part of the process or one of the steps that Defendants would undertake to resolve consumers' payday loans.   In numerous instances, Defendants' telemarketers have stated or implied that sending a form validation letter would result in the cancellation of some loans and that Defendants would renegotiate consumers' repayment terms for those loans that are not cancelled as a result of the "validation process."

21.     In numerous instances, Defendants' telemarketers have explained to consumers that they are able to lower the consumers' payments while still paying off the loans by the end of the program period because Defendants would negotiate an interest-free payment on the loans during the program.   For example, one of Defendants' telemarketers stated the following during an initial sales call that was recorded by an FTC investigator:

> If all of the loans qualify, we will combine all of those loans together
> and we will provide you with an interest-free payment to repay your
> payday loan debt.   So, essentially, you'll be repaying any of the debt
> that you owe back on these loans free of interest and fees. That's just
> a part of the financial hardship program.   We get all of the interest
> and fees eliminated for you just so that your -- your payments are normally
> about 40 to 50 percent less than where you're currently paying on the loan.

22.     In numerous instances, Defendants' telemarketers have routinely assured consumers that

their payments in the program would go towards paying off consumers' loans.   The following is

a typical and illustrative excerpt from Defendants' sales pitch that was recorded by an FTC

investigator:

> DEFENDANTS' TELEMARKETER:   We make sure that they
> were licensed to do business and we get the loans settled and
> paid off for you.
>
> CALLER:   Okay.   So, you guys pay my loans for me or do
> I pay these people?
>
> DEFENDANTS' TELEMARKETER:   Now, you'll make your
> payments through our company.   The funds that you provide by going
> through the program will go towards settling and paying off
> your loan[s] (sic).

23.     Defendants routinely have discussed a low payment, typically between $98 and $160,

that the consumer would make on a bi-weekly basis to Defendants for the length of the program,

typically between four and six months.   In numerous instances, when consumers ask about the

cost of the program, Defendants' telemarketers have claimed the program fee is a portion of or

included in consumers' bi-weekly payments.   On some occasions, Defendant's telemarketers

have stated the fee would be a small amount, such as $38, collected only after the work was

done.

8

## Enrollment in the Financial Hardship Program

24.     Once consumers agree to enroll in Defendants' program, Defendants' telemarketers have instructed them to immediately make their first payment to Defendants, typically via Moneygram or Western Union.

25.     After receiving at least one payment from consumers, Defendants have then required consumers to call Defendants' telemarketers to obtain an online enrollment "PIN" code.   In many instances, Defendants' telemarketers have then walked consumers through online enrollment where consumers are instructed to click on the part of Defendants' website that says "sign agreement."

26.     Defendants have next emailed consumers several form attachments including a "New Client Information Packet," "Bank Account Letter," "Lender List," and an "Authorization to Communicate."   Defendants have instructed consumers that the New Client Information Packet is for their information, that the Lender List and Authorization to Communicate need to be completed and faxed back to Defendants, and that the Bank Account Letter is for delivery to consumers' banks.   Defendants have instructed consumers to cease making payments to their lenders and "secure" their bank accounts by closing the accounts from which their lenders were withdrawing payments.   Defendants have also instructed consumers to open new bank accounts and provide the new account information to Defendants for the bi-weekly collection of program payments.

**Defendants' Actual Services**

27.     Defendants' efforts for consumers typically have not resulted in the promised

negotiations, lowered interest rates, and debt relief but, rather, consist of sending a form letter to

consumers' lenders requesting "validation" of the loans.

28.     Many, if not all, payday lenders have simply ignored Defendants' validation form letters

and continued collection efforts.   Defendants' validation program appears to mimic the title and

general subject matter from certain inapplicable provisions of the Fair Debt Collection Practices

Act ("FDCPA").   15 U.S.C. § 1692 –1692p.   The FDCPA contains a section on "Validation of

debts," setting forth circumstances where consumers have the right to, within a specific time

period, request the underlying data supporting collection attempts by those debt collectors

covered by the statute.   15 U.S.C. § 1692g.   However, in most situations, payday lenders

collecting on their own behalf are not covered by the FDCPA. 15 U.S.C. § 1692a (4) and (6).

29.     Typically, consumers have learned at the end of their program that Defendants failed to

resolve consumers' payday loans and that consumers, in fact, were still obligated to repay their

payday loans under the original terms.   Consumers have learned that, despite the representations

during the initial sales call with Defendants' telemarketers, their lenders did not receive

payments on their behalf from Defendants.

30.     In numerous instances, consumers have contacted Defendants at or near the end of their

Payday Support Center program period to determine why their loans have not been paid off.

Defendants' representatives have typically informed these consumers that they were mistaken

about the services Defendants offered and that Defendants had only been engaged to perform

"loan validations."   Defendants have then attempted to upsell consumers to accomplish the

10

results they had originally promised, encouraging consumers to enroll in a second debt relief

program operated by third party affiliates.

## VIOLATIONS OF THE FTC ACT

31.     Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), prohibits "unfair or deceptive acts or

practices in or affecting commerce."

32.     Misrepresentations or deceptive omissions of material fact constitute deceptive acts or

practices prohibited by Section 5(a) of the FTC Act.   15 U.S.C. § 45(a).

### Count I

33.     In numerous instances in connection with the advertising, marketing, promotion, offering

for sale, or sale of debt relief services, Defendants have represented, directly or indirectly,

expressly or by implication, for consumers who retain their services, that:

    A.     Defendants generally will pay off or otherwise eliminate consumers' payday

           loans;

    B.     Defendants generally will successfully negotiate interest-free payments on

           consumers' payday loans during the time-period of consumers' enrollment in

           Defendants' program;

    C.     consumers' creditors generally will cancel their payday loans as a result of

           receiving a form letter requesting "validation" of the payday loans from

           Defendants;

    D.     consumers' payments to Defendants will be applied to pay off their payday  loans;

    E.     Defendants generally will pay off or otherwise eliminate all of the consumers'

           payday loans in a short time period, such as four to six months; and

F.      Defendants' fee is only a small portion of consumers' program payments to

Defendants.

34.     In truth and in fact, in numerous instances in which Defendants have made the

representations set forth in paragraph 33, such representations were false or not substantiated at

the time the representations were made.

35.     Therefore, Defendants' representations as set forth in paragraph 33 are false and

misleading and constitute a deceptive act or practice in violation of Section 5(a) of the FTC Act,

15 U.S.C. § 45(a).

### VIOLATIONS OF THE TELEMARKETING SALES RULE

36.     Congress directed the FTC to prescribe rules prohibiting abusive and deceptive

telemarketing acts or practices pursuant to the Telemarketing Act, 15 U.S.C. § 6101 *et seq*.   The

FTC adopted the original Telemarketing Sales Rule in 1995, extensively amended it in 2003, and

amended certain provisions thereafter.

37.     Defendants have been "seller[s]" or "telemarketer[s]" engaged in "telemarketing" as

those terms are defined in the TSR, 16 C.F.R. § 310.2(aa), (cc), and (dd).   Under the TSR, a

"telemarketer" means any person who, in connection with telemarketing, initiates or receives

telephone calls to or from a customer or donor.   16 C.F.R. § 310.2(cc).   A "seller" means any

person who, in connection with a telemarketing transaction, provides, offers to provide, or

arranges for others to provide goods or services to a customer in exchange for consideration.   *Id.*

§ 310.2(aa).

38.     As amended, effective September 27, 2010, the TSR prohibits sellers and telemarketers

from misrepresenting, directly or by implication, in the sale of goods or services, any material

aspect of any debt relief service, including, but not limited to, the amount of money or the percentage of the debt amount that a customer may save by using such service; the amount of time necessary to achieve the represented results; [and]…the effect of the service on collection efforts of the customer's creditors or debt collectors.   16 C.F.R. § 310.3(a)(2)(x).

39.     Under the TSR, a "debt relief service" means any program or service represented, directly or by implication, to renegotiate, settle, or in any way alter the terms of payment or other terms of the debt between a person and one or more unsecured creditors or debt collectors, including, but not limited to, a reduction in the balance, interest rate, or fees owed by a person to an unsecured creditor or debt collector.   16 C.F.R. § 310.2(m).

40.     As amended effective October 27, 2010, the TSR prohibits sellers and telemarketers from requesting or receiving payment of any fees or consideration for any debt relief service until and unless:

        A.     the seller or telemarketer has renegotiated, settled, reduced, or otherwise altered the terms of at least one debt pursuant to a settlement agreement, debt management plan, or other such valid contractual agreement executed by the customer;

        B.     the customer has made at least one payment pursuant to that settlement agreement, debt management plan, or other valid contractual agreement between the customer and the creditor or debt collector; and

        C.     to the extent that debts enrolled in a service are renegotiated, settled, reduced, or otherwise altered individually, the fee or consideration either:

            i.     bears the same proportional relationship to the total fee for renegotiating,

13

settling, reducing, or altering the terms of the entire debt balance as the

individual debt amount bears to the entire debt amount.   The individual

debt amount and the entire debt amount are those owed at the time the

debt was enrolled in the service; or

ii.   is a percentage of the amount saved as a result of the renegotiation,

settlement, reduction, or alteration.   The percentage charged cannot

change from one individual debt to another.   The amount saved is the

difference between the amount owed at the time the debt was enrolled in

the services and the amount actually paid to satisfy the debt.   16 C.F.R.

§ 310.4(a)(5)(i).

41.     Defendants are "sellers" or "telemarketers" of "debt relief services," as defined by the

TSR, 16 C.F.R. § 310.2(aa), (cc), and (m).

42.     Pursuant to Section 3(c) of the Telemarketing Act, 15 U.S.C. § 6102(c), and Section

18(d)(3) of the FTC Act, 15 U.S.C. § 57a(d)(3), a violation of the TSR constitutes an unfair or

deceptive act or practice in or affecting commerce, in violation of Section 5(a) of the FTC Act,

15 U.S.C. § 45(a).

## Count II

43.     In numerous instances on or after October 27, 2010, in connection with the telemarketing

of debt relief services, Defendants have requested or received payment of fees or consideration

for debt relief services before:   (a) they have renegotiated, settled, reduced, or otherwise altered

the terms of at least one debt pursuant to a settlement agreement, debt management plan, or other

such valid contractual agreement executed by the customer; and (b) the customer has made at least one payment pursuant to that agreement.

44.     Defendants' acts and practices, as described in paragraph 43, are abusive telemarketing acts or practices that violate Section 310.4(a)(5)(i) of the TSR, 16 CFR § 310.4(a)(5)(i).

**Count III**

45.     In numerous instances, in connection with the telemarketing of debt relief services, Defendants have misrepresented, directly or indirectly, expressly or by implication, material aspects of their debt relief services, including, but not limited to, for consumers who retain their services, that:

A.     Defendants generally will pay off or otherwise eliminate all of the consumers' payday loans;

B.     Defendants generally will successfully negotiate interest-free payments on consumers' payday loans during the time-period of consumers' enrollment in Defendants' program;

C.     consumers' creditors generally will cancel their payday loans as a result of receiving a form letter requesting "validation" of the payday loans from Defendants;

D.     consumers' payments to Defendants will be applied to their payday loans ;

E.     Defendants generally will pay off or otherwise eliminate all of the consumers' payday loans in a short time period, such as four to six months; and

F.     Defendants' fee is only a small portion of consumers' program payments to Defendants.

46.     Defendants' acts or practices, as described in paragraph 45, constitute deceptive telemarketing acts or practices that violate Section 310.3(a)(2)(x) of the TSR, 16 C.F.R. § 310.3(a)(2)(x).

## CONSUMER INJURY

47.     Consumers have suffered and will continue to suffer substantial injury as a result of Defendants' violations of the FTC Act and the TSR.   In addition, Defendants have been unjustly enriched as a result of their unlawful acts or practices.   Absent injunctive relief by this Court, Defendants are likely to continue to injure consumers, reap unjust enrichment, and harm the public interest.

## THIS COURT'S POWER TO GRANT RELIEF

48.     Section 13(b) of the FTC Act, 15 U.S.C. § 53(b), empowers this Court to grant injunctive and such other relief as the Court may deem appropriate to halt and redress violations of any provision of law enforced by the FTC.   The Court, in the exercise of its equitable jurisdiction, may award ancillary relief, including rescission or reformation of contracts, restitution, the refund of monies paid, and the disgorgement of ill-gotten monies, to prevent and remedy any violation of any provision of law enforced by the FTC.

49.     Section 19 of the FTC Act, 15 U.S.C. § 57b, and Section 6(b) of the Telemarketing Act, 15 U.S.C. § 6105(b), authorize this Court to grant such relief as the Court finds necessary to redress injury to consumers resulting from Defendants' violations of the TSR, including the rescission or reformation of contracts, and the refund of money.

**PRAYER FOR RELIEF**

50.     Wherefore, Plaintiff FTC, pursuant to Sections 13(b) and 19 of the FTC Act, 15 U.S.C. §§ 53(b), 57b, and Section 6(b) of the Telemarketing Act, 15 U.S.C. § 6105(b), and the Court's own equitable powers, requests that the Court:

    A.    Award Plaintiff such preliminary injunctive and ancillary relief as may be necessary to avert the likelihood of consumer injury during the pendency of this action and to preserve the possibility of effective final relief, including but not limited to, preliminary injunction and expedited financial discovery;

    B.    Enter a permanent injunction to prevent future violations of the FTC Act and the TSR by Defendants;

    C.    Award such relief as the Court finds necessary to redress injury to consumers resulting from Defendants' violations of the FTC Act and the TSR, including but not limited to, rescission or reformation of contracts, restitution, the refund of monies paid, and the disgorgement of ill-gotten monies; and

    D.    Award Plaintiff the costs of bringing this action, as well as such other and additional relief as the Court may determine to be just and proper.

Respectfully submitted,

JONATHAN E. NUECHTERLEIN
General Counsel

Dated:   February 18, 2015          s/K. Michelle Grajales
                                    K. Michelle Grajales
                                    Miya Rahamim
                                    Federal Trade Commission
                                    600 Pennsylvania Ave., NW
                                    Mail Stop CC-10232
                                    Washington, DC 20580
                                    (202) 326-3172 (Grajales)
                                    (202) 326-2351 (Rahamim)
                                    mgrajales@ftc.gov; mrahamim@ftc.gov

                                    Attorneys for Plaintiff
                                    FEDERAL TRADE COMMISSION