## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | |
|---|---|
| FEDERAL TRADE COMMISSION, | ) |
| | ) |
|     Plaintiff, | ) |
| | ) |
| v. | ) CIVIL ACTION  15-0084-WS-B |
| | ) |
| PSC ADMINISTRATIVE, LLC, etc., | ) |
| et al., | ) |
| | ) |
|     Defendants. | ) |

## ORDER

This matter is before the Court on the plaintiff's motion for summary judgment.  (Doc. 51).  The parties have filed briefs and evidentiary materials in support of their respective positions, (Docs. 51, 62, 64), and the motion is ripe for resolution.  After careful consideration, the Court concludes the motion is due to be denied.

## BACKGROUND

According to the amended complaint, (Doc. 55), the entity defendants ("Payday" and "Coastal") operated as a common enterprise, pursuant to which they engaged in unfair or deceptive acts or practices affecting commerce, in violation of the Fair Trade Commission Act ("the Act").  The entity defendants were also sellers or telemarketers of debt relief services within the contemplation of the plaintiff's Telemarketing Sales Rule ("the Rule"), in the course of which they violated various provisions of the Rule.  The individual defendants ("Irby" and "Hughes") formulated, directed, controlled and/or participated in the acts and practices of the common enterprise.  Count One alleges violations of the Act, and Counts Two and Three allege violations of the Rule.  The plaintiff seeks wide-ranging injunctive relief against all defendants and monetary relief against all

defendants, jointly and severally, totaling almost $24 million.  The plaintiff hopes to accomplish all this on the instant motion.

## DISCUSSION

Summary judgment should be granted only if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  The party seeking summary judgment bears "the initial burden to show the district court, by reference to materials on file, that there are no genuine issues of material fact that should be decided at trial." *Clark v. Coats & Clark, Inc.,* 929 F.2d 604, 608 (11th Cir. 1991).  The moving party may meet its burden in either of two ways: (1) by "negating an element of the non-moving party's claim"; or (2) by "point[ing] to materials on file that demonstrate that the party bearing the burden of proof at trial will not be able to meet that burden." *Id*. "Even after *Celotex* it is never enough simply to state that the non-moving party cannot meet its burden at trial." *Id*.; *accord Mullins v. Crowell*, 228 F.3d 1305, 1313 (11th Cir. 2000); *Sammons v. Taylor*, 967 F.2d 1533, 1538 (11th Cir. 1992).

"When the *moving* party has the burden of proof at trial, that party must show *affirmatively* the absence of a genuine issue of material fact: it must support its motion with credible evidence ... that would entitle it to a directed verdict if not controverted at trial. [citation omitted] In other words, the moving party must show that, on all the essential elements of its case on which it bears the burden of proof, no reasonable jury could find for the nonmoving party." *United States v. Four Parcels of Real Property*, 941 F.2d 1428, 1438 (11th Cir. 1991) (en banc) (emphasis in original); *accord Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993).

"If the party moving for summary judgment fails to discharge the initial burden, then the motion must be denied and the court need not consider what, if any, showing the non-movant has made." *Fitzpatrick*, 2 F.3d at 1116; *accord Mullins*, 228 F.3d at 1313; *Clark*, 929 F.2d at 608.

"If, however, the movant carries the initial summary judgment burden ...,
the responsibility then devolves upon the non-movant to show the existence of a
genuine issue of material fact." *Fitzpatrick*, 2 F.3d at 1116. "If the nonmoving
party fails to make 'a sufficient showing on an essential element of her case with
respect to which she has the burden of proof,' the moving party is entitled to
summary judgment." *Clark*, 929 F.2d at 608 (quoting *Celotex Corp. v. Catrett*,
477 U.S. 317 (1986)) (footnote omitted); *see also* Fed. R. Civ. P. 56(e)(2) ("If a
party fails to properly support an assertion of fact or fails to properly address
another party's assertion of fact as required by Rule 56(c), the court may …
consider the fact undisputed for purposes of the motion ….").

In deciding a motion for summary judgment, "[t]he evidence, and all
reasonable inferences, must be viewed in the light most favorable to the
nonmovant …." *McCormick v. City of Fort Lauderdale*, 333 F.3d 1234, 1243
(11th Cir. 2003).

There is no burden on the Court to identify unreferenced evidence
supporting a party's position.[1]  Accordingly, the Court limits its review to the
exhibits, and to the specific portions of the exhibits, to which the parties have
expressly cited.  Likewise, "[t]here is no burden upon the district court to distill
every potential argument that could be made based upon the materials before it on
summary judgment," *Resolution Trust Corp. v. Dunmar Corp.*, 43 F.3d 587, 599
(11th Cir. 1995), and the Court accordingly limits its review to those arguments the
parties have expressly advanced.

---

[1] Fed. R. Civ. P. 56(c)(3) ("The court need consider only the cited materials, but it
may consider other materials in the record."); *accord Adler v. Wal-Mart Stores, Inc*., 144
F.3d 664, 672 (10th Cir. 1998) ("The district court has discretion to go beyond the
referenced portions of these [summary judgment] materials, but is not required to do
so.").  "[A]ppellate judges are not like pigs, hunting for truffles buried in briefs," and
"[l]ikewise, district court judges are not required to ferret out delectable facts buried in a
massive record …."  *Chavez v. Secretary, Florida Department of Corrections*, 647 F.3d
1057, 1061 (11th Cir. 2011) (internal quotes omitted).

## I. Counts One and Three.

According to the defendants, Payday "offer[ed] a payday loan validation program for customers with two or more high interest payday loans." (Doc. 62 at 8). According to the plaintiff, Payday misrepresented to potential customers that it would do much more than validate their payday loans.[2] Count One alleges that the defendants, on "numerous instances," made "false and misleading" representations, "directly or indirectly, expressly or by implication," that "constitute a deceptive act or practice in violation of Section 5(a)" of the Act, 15 U.S.C. § 45(a). Count Three alleges that the same conduct violates the Rule, 16 C.F.R. § 310.3(a)(2)(x). (Doc. 55 at 11-12, 15-16).

As the plaintiff acknowledges, (Doc. 55-1 at 30), "[t]o establish liability under section 5 of the [Act], the FTC must establish that (1) there was a representation; (2) the representation was likely to mislead customers acting reasonably under the circumstances[;] and (3) the representation was material." *Federal Trade Commission v. Tashman*, 318 F.3d 1273, 1277 (11th Cir. 2003). To obtain summary judgment, then, the plaintiff first must show what objectionable representations the defendants made, and it must do so with evidence sufficiently strong and uncontroverted that no reasonable factfinder could fail to find that the representations were made.

The representations alleged by the plaintiff, "for consumers who retain their services," are as follows:

1. "Defendants generally will pay off or otherwise eliminate consumers' payday loans."

---

[2] The plaintiff's theory is that the defendants "made at least six false or unsubstantiated representations to persuade consumers to enroll in their program." (Doc. 51-1 at 30). Although it appears that only Payday had contact with consumers before they enrolled, the Court will follow the plaintiff's practice of referring to all four defendants collectively, since the plaintiff seeks to impose liability on all of them for the same conduct.

2.  "Defendants generally will pay off or otherwise eliminate all of the consumers' payday loans in a short time period, such as four to six months."

3.  "Defendants generally will successfully negotiate interest-free payments on consumers' payday loans during the time-period of consumers' enrollment in Defendants' program."

4.  "[C]onsumers' creditors generally will cancel their payday loans as a result of receiving a form letter requesting 'validation' of the payday loans from Defendants."

5.  "[C]onsumers' payments to Defendants will be applied to pay off their payday loans."

6.  "Defendants' fee is only a small portion of consumers' program payments to Defendants."

(Doc. 55 at 11-12, 15; *accord* Doc. 51-1 at 30-31).  According to the plaintiff, its proof that these representations were made consists of "[c]onsumer complaints, declarations, scripts, a call recording, and the testimony of the Individual Defendants and two former employees," which "all show that Defendants' business model was permeated with unlawful practices."  (*Id*. at 5).

### A.  Consumer Complaints.

The "consumer complaints" addressed by the plaintiff in its principal brief are 256 complaints to the Better Business Bureau ("BBB").  (Doc. 55-1 at 10). The plaintiff has cited evidence that these complaints were registered and that "[a] lot of them" said the consumer had been told "they'd get X over the phone and then they got Y."  (Doc. 51-20 at 22-23).  Several circumstances, however, soften the value of this evidence.  First, the defendants have presented evidence that "[m]any" of these complaints "concerned long holds [sic] times for customer service," something irrelevant to the plaintiff's allegations.  (Doc. 62-2 at 6). Second, the defendants – and the plaintiff itself – have presented evidence that many of the customers' complaints were prompted, not by any genuine belief the

defendants had made the representations, but as a result of pressure from their payday lenders, who encouraged the defendants' customers to file such complaints in order to goad the defendants into giving the customers a refund – which monies could then be paid to the payday lenders.  (Doc. 51-20 at 23; Doc. 62-2 at 6; Doc. 62-3 at 7).[3]  Third, the plaintiff has presented evidence that poor practices of the BBB artificially inflated the number of complaints.  (Doc. 51-19 at 16-18).  Fourth, the plaintiff has not attempted to show that the "X" versus "Y" disparity in the BBB complaints always, often, or even occasionally corresponds to one of the six precise representations on which its case depends, and without evidence of such a correlation its evidence is next to useless.[4]  Simply asserting, as the plaintiff does, that the defendants "do not contest" the "credibility" of "hundreds of other complaining consumers," (Doc. 64 at 7), is not only incorrect but also beside the point, given the plaintiff's failure to make a case that the consumers' complaints fall within any of the six categories to which the plaintiff has limited its case.

In its reply brief, the plaintiff – out of the blue and without attribution – refers to "over five hundred complaints to the FTC and the Better Business Bureau."  (Doc. 64 at 2).  After much searching, the Court has stumbled upon a filed but uncited declaration from an FTC investigator, who says she reviewed "approximately 500 consumer complaints against [Payday] submitted to the FTC's Consumer Sentinel database," including those forwarded from the BBB (presumably, the same 256 discussed above).  (Doc. 51-3 at 6).  Pursuant to Rule 56(c)(3), and because the Court does not condone the injection of new material in

---

[3] In its reply brief, the plaintiff objects that the witnesses have failed to establish they have personal knowledge of whether consumers were prompted by their payday lenders to complain.  (Doc. 64 at 7 n.8).  Having introduced this evidence and invited the Court to consider it, (Doc. 55-1 at 10), the plaintiff cannot now object to its own evidence.

[4] A representation, for example, that the monthly payment would be "X" when it turned out to be "Y" would fall within the plaintiff's evidence regarding the BBB complaints but would fall outside the parameters of its amended complaint.

a reply brief,[5] the Court declines to consider this declaration.  Even were the Court to consider the declaration, however, it would not appreciably advance the plaintiff's case.  First, the Court is skeptical that the experience of 500 different individuals can be accurately, much less thoroughly, presented as an evidentiary matter in the eleven scant lines the declarant devotes to the issue.  Second, the declarant focuses on what consumers "believed," not on what they were told, and beliefs can be drawn from all manner of sources (including wishful thinking) inconsistent with the information actually being communicated.[6]

## B.  Declarations.

Payday did not make cold calls; instead, its program "was sold via inbound calls from customers responding to radio, internet and other advertising."  (Doc. 55 at 13).  The plaintiff's case focuses on representations made during what it terms the defendants' "misleading telephone pitch."  (Doc. 51-1 at 15).  The defendants have presented evidence that they received over 2.5 million inbound calls from almost 300,000 different persons, with 58,175 of them ultimately

---

[5] "[N]othing in the extant authorities, or in the Federal Rules of Civil Procedure, forbids a movant from making supplemental record submissions in a reply brief to rebut specific arguments raised by the non-movant's opposition brief."  *Hammons v. Computer Programs and Systems, Inc*., 2006 WL 3627117 at *14 (S.D. Ala. 2006).  Absent such a situation, however, "[i]t is well accepted that … submission of new facts in [a] reply brief is improper."  *Sideraulic System SpA v. Briese Schiffahrts GmbH & Co*., 2011 WL 3204521 at *2 n.4 (S.D. Ala. 2011) (internal quotes omitted).  The plaintiff's belated reliance on the FTC investigator's declaration does not fall within the *Hammons* exception but within the *Sideraulic* general rule.

[6] The plaintiff mentions, but does not focus on, a complaint from the Attorney General's office and a letter from a consumer's attorney.  (Doc. 51-1 at 10).  With regard to the former, the plaintiff has not submitted the deposition excerpt on which it relies. With regard to both, the record is silent as to what the communications stated, such that they add nothing to the plaintiff's body of complaints.

contracting with Payday.  (Doc. 62-1 at 12-13).  The plaintiff relies on declarations from ten of them.  Ten.[7]

The plaintiff shrugs that "[c]ourts have expressly rejected challenges to the number of declarations relative to the potential pool of victims …," (Doc. 64 at 8), but the cases on which it relies were addressing the adequacy of proof that the defendant's misrepresentations were likely to mislead a reasonable consumer.[8] The very different question posed here, however, is the adequacy of the plaintiff's proof that the defendants made the alleged representations to begin with and that they did so with the frequency the plaintiff itself assumes is required to justify the relief it seeks.[9]  In that context, the paucity of declarations is absolutely relevant, because the plaintiff is asking the Court not merely to extrapolate that the experience of ten was the experience of thousands but to hold that no reasonable factfinder could fail to make that extrapolation.

---

[7] The plaintiff says there are nine, (Doc. 64 at 7), but the defendants, and the Court, count ten.  (Docs. 51-4 to -7, 51-9 to -13, 51-30).

[8] In addition, one of the opinions was a post-trial ruling on the merits, where only a preponderance of the evidence was required, and a second was considering a motion for preliminary injunction, where only a reasonable likelihood of success on the merits was required.  Here, in contrast, the plaintiff must show that the evidence is so strong that no reasonable factfinder could disagree with the plaintiff.

[9] The plaintiff insists that the defendants' "business model was permeated with unlawful practices," that their "entire business was premised on making misrepresentations," and that their "systematic deception" is what warrants the injunctive and monetary relief it seeks to receive on the instant motion.  (Doc. 51-1 at 15, 30, 45). The plaintiff acknowledges that the Court, in evaluating its request for injunctive relief, must consider the "isolated or recurrent nature of the infraction," and it argues that injunctive relief is warranted precisely because "the misrepresentations were such an essential feature of Defendants' sales tactics that they permeated every aspect of the business."  (*Id*. at 46-47).  Similarly, the plaintiff justifies the monetary relief it demands – return of the business's gross revenues (less refunds) – on the grounds that every dollar of revenues (and thus every payment by consumers) represents "unjust enrichment" (obtained only by misrepresentation).  (*Id*. at 49).  Finally, the plaintiff relies on a presumption of actual reliance by consumers, which it admits requires proof that that the defendants' representations were "widely disseminated."  (*Id*.).

At any rate, the evidence the plaintiff extracts from these declarations is underwhelming.  The plaintiff first invites the Court to peruse the declarations (totaling almost 40 pages) *in globo* and find for itself information that might support the plaintiff's case.  (Doc. 51-1 at 16, ¶ 45).  That invitation, extended in disregard of Rule 56(c)(3) and Civil Local Rule 56(a), is declined.  The Court instead addresses only the specific portions of specific declarations that the plaintiff specifically cites as reflecting a misrepresentation by the defendants during the telephone solicitation calls.

1.  That the defendants generally would pay off or otherwise eliminate consumers' payday loans.  The plaintiff identifies only two declarations asserting that such a representation was made.  (Doc. 51-1 at 16, ¶ 45; *id*. at 17, ¶ 47).[10]

2.  That the defendants generally would pay off or otherwise eliminate consumers' payday loans in a short period, such as four to six months.  The plaintiff identifies several declarations that assert the declarant was given a program length of between four and six months, (Doc. 51-1 at 19, ¶ 50), but these declarants do not say they were told their loans would be paid off or otherwise eliminated within that time.

3.  That the defendants generally would successfully negotiate interest-free payments on consumers' payday loans during the consumers' enrollment in the defendants' program.  The plaintiff cites a single declaration to support this proposition, and it does not do so.  (Doc. 51-1 at 17-18, ¶ 48).[11]

4.  That consumers' creditors generally would cancel their payday

---

[10] (Doc. 51-7 at 2 (sales rep "said that at the end of the process, Payday … would pay off my loans in their entirety"); Doc. 51-12 at 1 ("PSC stated that they would validate my loans, cancel any loans that were illegal, and then pay back my legitimate loans.")).

[11] (Doc. 51-6 at 1-2 (sales rep explained that Payday would "then proceed by working with my lenders to reduce my monthly payments and lower my interest rates.")).

loans as a result of receiving a form letter requesting 'validation' of the payday loans from the defendants.  The plaintiff cites four declarations as supporting this allegation, (Doc. 51-1 at 17, ¶ 47), but none actually does so.

5.  That consumers' payments to the defendants would be applied to pay off their payday loans.  The plaintiff cites seven declarations to show that the defendants made this representation, (Doc. 51-1 at 18, ¶ 49), but only one of them contains such an assertion.[12]  The other six declarants state only that they "believed," "thought" or "understood" this would happen.

6.  That the defendants' fee was only a small portion of the consumers' program payments to the defendants.  The plaintiff cites only one declaration in support of this allegation.  (Doc. 51-1 at 19, ¶ 52).[13]

The plaintiff, in sum, has evidence from its declarants that the first representation was made twice and that the fifth and sixth representations were made once each.  Of this grand total of four representations, three were made by the same sales rep to the same declarant on the same telephone call.

The plaintiff has attempted to artificially heighten the probative value of the declarations in at least three ways.  First, and most common, it has relied on declarants' statements as to what they thought, understood or believed about the program rather than on their (non-existent) statements as to what the defendants' representatives actually said.  While it may sometimes be permissible for a factfinder to infer that the understanding of a customer about a defendant's program arose from the defendant's representation regarding the program, there is no rule of law or evidence that compels a factfinder to draw such an inference.

---

[12] (Doc. 51-7 at 1 (sales rep "explained … that this money would be used to pay down my debts" and "told me that my payments to Payday … would go to my lenders")).

[13] (Doc. 51-7 at 1 (sales rep explained that the declarant's $115 biweekly payment "would be used to pay down my debts" and that Payday "would take at most $38 from my account for administrative costs, and only after my loans were completely paid off")).

Here, where the plaintiff must show that no reasonable factfinder could fail to find for the plaintiff, that distinction is crucial.

Second, the plaintiff has at times emphasized alleged misrepresentations made after the declarant entered a contract with Payday.  The basis of the plaintiff's lawsuit and motion, however, is that the defendants made misrepresentations "to persuade consumers to enroll in their program," (Doc. 51-1 at 30), and the plaintiff has failed to show that liability can be based on later misrepresentations.[14]  While the making of later misrepresentations might support an inference that similar misrepresentations were made pre-enrollment, it remains the case that the plaintiff cannot prevail on its motion for summary judgment on the strength of merely permissible inferences.

Third, the plaintiff has occasionally suggested that the defendants made pre-enrollment misrepresentations other than the six made the basis of its lawsuit. Again, even if a permissible inference might be drawn that a defendant making certain, uncharged misrepresentations also made other, charged misrepresentations, permissible inferences cannot sustain the plaintiff's burden on motion for summary judgment.

**C.  Scripts.**

The plaintiff relies on several pages of "scripts" to show that the defendants routinely made certain representations.  The first document is styled, "Keep It Simple."  (Doc. 51-15 at 48).  It reads in its entirety as follows:

> This is a **FINANCIAL HARDSHIP PROGRAM**, made up of **THREE** steps.
>
> 1) We **ASSIST** you in securing your account away from the lenders
> 2) We make sure the lenders are licensed to do business in your state and are not over charging you in fees and interest
> 3) If necessary, we get the loans settled and paid off

---

[14] On the contrary, the amended complaint pegs all six representations on which suit is brought to the defendants' "telemarketing pitch."  (Doc. 55 at 7-8).

> If you are giving the client any other explanation of the program, you are
> not explaining it correctly.  Don't over complicate your sale.
>
> **This is how you should explain the program every time!**

(*Id.* (emphasis in original)).

The second document is styled, "Payday Sales Script."  (Doc. 51-15 at 49).

After some preliminary questions, the script continues as follows:

> Okay, just a little information about our program, we offer a financial
> hardship program that has three steps
>
> > The first step is we will help you secure your account away from the
> > lenders
> >
> > The second step is We will make sure the lenders are licensed to do
> > business in your state.
> >
> > Then we will get your debt settled and paid off.

(*Id.*).

The third document is styled, "Common questions and how to answer

them."  (Doc. 51-18 at 54).  In response to the question, "What are your fees?" is

the following:

> Each lender is assigned a fee based off what it will take to Validate
> that lender, so that fee's could vary.  But all of the fees are included
> in your program payments so no additional fees will be charged.
> You will only have the 1 payment coming out each pay-period for
> the total of X(term) months.  The payments made into the program
> goes toward making sure these lenders are licensed and or [sic]
> charging the legal amounts of interest in your state.  And then getting
> the lenders settled and paid off.  So basically as long as you complete
> the program your debt will be completely validated, settled and paid
> off if necessary.
>
> NOT ACCEPTABLE!  (WE ONLY CHARGE 38.47 MONTHLY
> FEES)

(*Id.* (emphasis in original)).

The fourth document, bearing the heading of "Breaking the Pay Day Loan Cycle," describes itself as "our easy, step-by-step 'Breaking The Cycle' guide." (Doc. 51-15 at 47).  It contains four numbered paragraphs styled, in order, "Enroll With Payday Support Center," "Secure Your Account," "Validate Your Loan," and "Settle The Loans."  The latter paragraph states in pertinent part as follows:

> In the event, that some of your loans are determined to be valid, we have partnered with a settlement provider that can potentially settle your remaining balance for significantly less than you may owe now!  Working with our premier settlement partner, Infinity PDS, upon your request, we will forward your entire account and associated documents directly into their computer system.  They will immediately begin to process your account and determine the cheapest and quickest way to finalize your situation!

(*Id.*).

The fifth document, which appears to be a continuation of the third, is likewise styled, "Payday Sales Script."  (Doc. 51-15 at 50).  In the portion cited by the plaintiff, it reads as follows:

> So it looks like you have about $1,560 in total debt between all 4 loans, that sound correct?
>
> Okay, Ms/Mr _____, what we can do is set you up for an ___ month program.  Your payments will be ____ every two weeks for ___ months.
>
> Over the ___ month program, you will no longer be making payments to your lenders, just the payments of ____ every pay period.  How does that sound?

(*Id.*).[15]

The plaintiff construes this fifth document as an "offe[r] to substantially reduce consumers' monthly payments from what consumers owed their payday

---

[15] The plaintiff purports to rely on a sixth document, but it either has not been submitted or the plaintiff has not cited it correctly.  (Doc. 51-1 at 16 (citing to "PX12 … Ex. 10 p. 110 (script)")).  It thus cannot be considered by the Court.  However, from the plaintiff's description it appears to add nothing to what is contained in the first three documents.

lenders at the time of enrollment." (Doc. 51-1 at 15).  The plaintiff explains that the document "quotes lower payments." (*Id*. at 16).  Given the failure of the document to identify either what the consumer's existing payments are or what the proposed new payments are, that is something of a stretch but, in any event, lower periodic payments is not one of the representations on which the plaintiff's amended complaint is based.

The other four documents (which the Court terms for ease of reference "Simple," "Script," "Questions" and "Cycle," respectively), require more extended discussion.  Simple and Script both describe a single program with three steps, the third being that "we get the loans settled and paid off" or that "we will get your debt settled and paid off."  If such statements were regularly made to potential customers as part of the defendants' sales pitch, it would presumably establish the first representation on which the plaintiff's lawsuit is based:  that the defendants generally would pay off or otherwise eliminate consumers' payday loans.

The plaintiff finds it obvious that this description was routinely presented in the telemarketing pitch.  After all, Simple expressly states that "[t]his is how you should explain the program every time," and Script on its face purports to be a "script."  The defendants, however, have presented evidence that these documents were not truly scripts to be read to potential customers over the telephone but a shorthand overview for the benefit of the sales reps.  (Doc. 62-4 at 6).  The defendants have also presented testimony from Payday's sales training manager (who personally trained over 100 sales reps) that sales reps were carefully trained never to state or suggest that consumers' payday loans would be paid off or eliminated through the defendants' program.  (*Id*. at 5).[16]  Rather, sales reps were trained to maintain, in all customer communications, a clear separation between the validation service offered by Payday and the debt settlement service of the third party and to explain the debt-settlement concept as an option for customers to

---

[16] The defendants have presented similar evidence as to each of the six representations alleged in the amended complaint.  (*Id*. at 5-6).

use the third-party provider if the validation service offered by the defendants did not resolve the loan. (*Id*. at 5-6). Sales reps were warned they would be subject to discipline, up to and including termination, for representing that the defendants' program included debt settlement or debt relief services. (*Id*. at 3, 5, 11). The plaintiff in its reply brief ignores this evidence, but the Court cannot, and the defendants' evidence renders controverted the plaintiff's evidence that sales reps routinely told consumers that the defendants would pay off or otherwise eliminate the consumers' payday loans.

The plaintiff pays scant attention to Questions and, as a practical matter, the defendants' evidence discussed above makes it less than controlling. While it asserts that defendant Hughes admitted that sales reps were required to use this document, (Doc. 51-1 at 18), the plaintiff has not submitted the deposition pages on which it relies for this proposition. Moreover, Questions is inherently ambiguous, since it is far from clear whether the approved answer is the verbose one that includes the language on which the plaintiff seizes or the concise one found in the final, underlined, all-caps statement.

That leaves Cycle. As the plaintiff notes, this document was sent to customers only after they enrolled in the program, (Doc. 51-1 at 20; Doc. 64 at 3), so it comes too late to support the plaintiff's amended complaint (which alleges representations only in the pre-contract, sales-pitch period). While the plaintiff suggests that defendant Irby has admitted the defendants required sales reps to use this document, (Doc. 51-1 at 17), the deposition pages on which it relies do not support that proposition. But it is unclear how Cycle would help the plaintiff in any event, since it contains no obvious representation that the defendants generally will pay off or otherwise eliminate consumers' payday loans. On the contrary, it states only that a third party (not the defendants), upon a consumer's request (not automatically), potentially might (not generally would) find a way to settle the consumer's payday loans for less than their face amount (not that the third party would itself pay off or eliminate the debt).

### D.  Defendants' Testimony.

As for the "testimony of the Individual Defendants and two former employees," (Doc. 51-1 at 5), the Court's discussion of the (missing and inapposite) testimony of Hughes and Irby regarding Questions and Cycle essentially exhausts the plaintiff's testimonial evidence regarding the making and content of any representations.  It clearly does not advance the plaintiff's case.[17]

### E.  Recorded Call.

Finally, the plaintiff relies on a recording of a March 2014 call one of its investigators made to Payday, which call was handled by a sales rep named Shaquasia.  (Doc. 51-3 at 18-32).  The transcript includes the following statements by Shaquasia, all highlighted by the plaintiff:

- "If all of the loans qualify, we will combine all of those loans together and we will provide you with an interest-free payment to repay your payday loan debt.  So, essentially, you'll be repaying any of the debt that you owe back on these loans free of interest and fees.  …  We get all of the interest and fees eliminated for you …."  (*Id*. at 23-24).

- "Upon (inaudible) enrolling into the program, … we get the loans settled and paid off for you."  (*Id*. at 24).

- "The funds that you provide by going through the program will go towards settling and paying off your loan."  (*Id*.).

---

[17] In the introduction to its principal brief, the plaintiff states that the "Defendants have conceded that their telemarketers routinely told consumers that their debts would be paid off as a result of Defendants' program …."  (Doc. 51-1 at 5).  The plaintiff does not identify where in the record any such concession lies, and the Court is unaware of any. Since the testimony of Hughes and Irby regarding Questions and Cycle is all the plaintiff offers from the defendants regarding the making of such a representation, it is safe to say there has been no such concession.

- "[T]here is a program fee that is included in your payment. Normally, with clients with three payday loans, they're paying about $98 biweekly on – on all three of the loans, and my company's fee is included in that $98 payment."  (*Id*.).

- After securing bank accounts and validation, "the final thing that we do is we get the loan settled and paid off so that by the end of your program – at the end of your program, you would be completely done with all – with three of these payday loans." (*Id*. at 28).

The quoted excerpts appear to contain at least the first, third and fifth representations on which suit is based.  But one call out of 2.5 million cannot of itself eliminate any fact issue as to whether it reflects the defendants' "business model," (Doc. 51-1 at 15), especially in the face of the defendants' evidence that sales reps were trained to avoid such statements and were threatened with termination for non-compliance.

In its reply brief, the plaintiff argues that post-contract communications from the defendants continued the misrepresentation that they would settle their clients' debts.  (Doc. 64 at 2-5).  This argument, based on documents on which the plaintiff did not previously rely, appears to be raised too late to be considered but, in any event, the most it could do for the plaintiff is support a permissible inference that, if the defendants made such representations after the contract was entered, they also did so beforehand.  Again, the plaintiff cannot prevail on summary judgment by relying on permissible inferences.

### F.  Summary.

At best, then, all that is uncontroverted is that the defendants made the first alleged representation to two customers and also made the fifth and sixth representation one time each, to one of the same two customers.  While it is also uncontroverted that Shaquasia once made the first, third and fifth representations,

she was speaking with an FTC investigator, not a customer, so there appears to be no consumer injury. The plaintiff does not seek a partial summary judgment as to these isolated acts, and it does not argue that it is entitled on the basis of them to the sweeping injunctive and monetary relief it seeks. The plaintiff's motion for summary judgment as to Counts One and Three is thus due to be denied.

## II.  Count Two.

"It is an abusive telemarketing act or practice and a violation of this Rule for any seller or telemarketer to … [r]eques[t] or receiv[e] payment of any fee or consideration for any debt relief service until and unless … [t]he seller or telemarketer has renegotiated, settled, reduced, or otherwise altered the terms of at least one debt pursuant to a … valid contractual agreement executed by the customer [and] [t]he customer has made at least one payment pursuant to that … agreement …." 16 C.F.R. § 310.4(a)(5)(i). Count Two alleges a violation of this provision of the Rule. (Doc. 55 at 14-15). The threshold question is whether the defendants requested or received payment for a "debt relief service" within the Rule.[18]

> Debt relief service means any program or service represented, directly or by implication, to renegotiate, settle, or in any way alter the terms of payment or other terms of the debt between a person and one or more unsecured creditors or debt collectors, including, but not limited to, a reduction in the balance, interest rate, or fees owed by a person to an unsecured creditor or debt collector.

16 C.F.R. § 310.2(o).

The plaintiff, devoting a single paragraph to the issue, simply announces that the defendants' business meets the regulatory definition "because Defendants' telemarketers represented that Defendants would renegotiate terms of the debt – specifically, the repayment obligations, interest rates, and time-period of

---

[18] The "debt relief service" question is also presented as to Count Three. (Doc. 55 at 12-13, 15).

repayment – between customers and lenders." (Doc. 55-1 at 38-39). As reflected in Part I, however, it is not uncontroverted that the sales reps did so.

In its reply brief, the plaintiff tries a new tack. Even the debt validation portion of the Defendants' business, it says, constitutes "debt relief services" because Cycle says that, "[a]fter your account is secured and your loans validated, you may notice that you may very well owe significantly less than you believe you owe now!" (Doc. 51-15 at 47). According to the plaintiff, "[t]his demonstrates that Defendants marketed the validation portion of [the] program as a means to renegotiate, settle, or reduce the balance of consumers' debts, placing it squarely within the definition of 'debt relief' under the [Rule]." (Doc. 64 at 12).

The plaintiff mentioned Cycle in its principal brief, but it neither cited the portion of the document on which it now relies nor invoked it in support of its analysis of the "debt relief service" requirement. (Doc. 55-1 at 15-16, 38-39). Nor did the plaintiff assert or suggest that validating debts constitutes debt relief services under the Rule. "District courts, including this one, ordinarily do not consider arguments raised for the first time on reply." *Gross-Jones v. Mercy Medical*, 874 F. Supp. 2d 1319, 1330 n.8 (S.D. Ala. 2012) (citing cases and explaining rationale). The plaintiff does not explain why it should be exempt from this rule.

The argument suffers from other problems as well. The plaintiff says the focus of the "debt relief service" inquiry is on how the "telemarketers" "marketed" the program to potential customers. (Doc. 55-1 at 38; Doc. 64 at 12). As noted in Part I.C, however, the only evidence is that Cycle was not used by the sales reps but was only sent to customers after they had enrolled.

There is also the matter of the disclaimers contained in the contracts:

> **Please note that, pursuant to this Contract, Company will not renegotiate, settle, or in any way change the terms of any of your debts.**

(Doc. 51-4 at 10 (boldface in original)).

CLIENT UNDERSTANDS THAT COMPANY WILL NOT RENEGOTIATE, SETTLE, OR IN ANY WAY CHANGE THE TERMS OF ANY DEBT.

(*Id*. at 11 (all caps in original)).

The plaintiff argues at length that these disclaimers are as a matter of law incapable of showing that the defendants' alleged representations were unlikely to mislead customers acting reasonably under the circumstances, for purposes of the second element of its claims under Counts One and Three.[19]  But the plaintiff has not similarly argued that the disclaimers are irrelevant to the different question of whether the defendants' program was "represented" as one "to renegotiate, settle, or in any way alter the terms of payment or other terms" of consumers' payday loans, as is necessary to trigger coverage under the Rule.  The Court has no fixed opinion on the question but notes it simply to underscore the inadequacy of the plaintiff's treatment of the threshold, "debt relief service" issue.

## CONCLUSION

For the reasons set forth above, the plaintiff's motion for summary judgment is **denied**.[20]

DONE and ORDERED this 17th day of June, 2016.

s/ WILLIAM H. STEELE
CHIEF UNITED STATES DISTRICT JUDGE

---

[19] Because the plaintiff's motion for summary judgment as to these counts is due to be denied on other grounds, the Court does not reach that issue.

[20] In its reply brief, the plaintiff invites the Court to at least grant it summary judgment "on the matter of common enterprise."  (Doc. 64 at 14).  While the Court has discretion to grant such partial relief when the summary judgment standard is met, Fed. R. Civ. P. 56(g), it may properly decline to exercise that discretion if it decides the effort is not worth the candle or that "it is better to leave open for trial facts and issues that may be better illuminated by the trial of related facts that must be tried in any event."  Fed. R. Civ. P. 56 advisory committee notes 2010 amendment.  The Court draws that conclusion and thus declines to consider the plaintiff's proposal.